# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA
# INDIANAPOLIS DIVISION

| | |
|---|---|
| INTERNATIONAL VENDING MANAGEMENT, INC., )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>MID-AMERICAN CHEMICAL SUPPLY CO., INC., )<br>)<br>Defendant. ) | Cause No. 1:09-cv-433-WTL-DML |

## ENTRY ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This cause is before the Court on the parties' cross-motions for summary judgment. The motions are fully briefed and the Court, being duly advised, **GRANTS IN PART AND DENIES IN PART** each motion for the reasons set forth below.

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c)(2) provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed and all reasonable inferences must be drawn in the non-movant's favor. *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007). Finally, the non-moving party bears the burden of

specifically identifying the relevant evidence of record, and "the court is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

The fact that the parties in this case have filed separate motions for summary judgment does not alter the standard set forth in Federal Rule of Civil Procedure 56(c)(2). When evaluating each side's motion the court simply "'construe[s] all inferences in favor of the party against whom the motion under consideration is made.'" *Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 561-62 (7th Cir. 2002) (quoting *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)).

## DISCUSSION

Defendant Mid-American Chemical Supply Co., Inc., ("MAC") is in the business of selling safety equipment. Plaintiff International Vending Management, Inc., ("IVM") is in the business of providing, managing, and maintaining vending machines, including machines used at manufacturing facilities to dispense safety equipment to employees. On November 6, 2006, MAC entered into a Supply Vending Agreement (the "Agreement") with IVM. The Agreement, which was drafted by IVM, was the only relationship between MAC and IVM. The Agreement had a term of five years and expressly provided that it was governed by Indiana law.

IVM alleges that MAC has breached the Agreement in several respects. "Interpretation of the language in a contract is a question of law especially suited for summary judgment proceedings." *J.C. Penney Co., Inc. v. Simon Property Group, Inc.*, 928 N.E.2d 579, 582 (Ind. Ct. App. 2010).

> Under Indiana state law, the court's goal in interpreting a contract is to "give effect to the parties' intent as reasonably manifested by the language of the

2

> agreement." *Reuille v. Brandenberger Constr., Inc.*, 888 N.E.2d 770, 771
> (Ind.2008). Indiana follows the rule that "extrinsic evidence is not admissible to
> add to, vary or explain the terms of a written instrument if the terms of the
> instrument are susceptible of a clear and unambiguous construction." *Univ. of S.
> Ind. Found. v. Baker*, 843 N.E.2d 528, 532 (Ind.2006) (citation omitted).
> Therefore, unless the terms of a contract are ambiguous, they will be given their
> plain and ordinary meaning. *Reuille*, 888 N.E.2d at 771.

*Holmes v. Potter*, 552 F.3d 536, 539 (7th Cir. 2008).

With these standards in mind, the issues raised in the parties' motions for summary judgment are addressed, in turn, below.

### *Breach of Exclusivity Provision*

The Agreement contains the following provision:

> You [MAC] hereby appoint [IVM] as your exclusive manager for the dispensing
> and vending of safety and other products to your customer employees and your
> exclusive provider of the vending machines needed for that purpose at your
> present Locations.

IVM alleges that MAC breached this provision by providing one of its customers vending machines from Apex Industrial Technologies LLC ("Apex"), one of IVM's competitors. Both parties move for summary judgment with regard to this claim.

The facts relevant to this claim are as follow. MAC is a certified vendor for a procurement company called Direct Sourcing Solutions, Inc. ("DSSI"). One of DSSI's customers is Johnson Controls. When Johnson Controls asked DSSI to procure vending machines to dispense safety products at its Athens, Tennessee facilities (hereinafter referred to as "Athens"),[1] DSSI set up meetings between Johnson Controls and three potential vendors, including MAC, that it believed could supply vending machines that met all of Johnson

---

[1] It is undisputed that Athens was one of MAC's "present Locations" as that term is used in the Agreement.

3

Control's specifications. MAC provided Johnson Controls with the option of leasing or purchasing Apex vending machines. Apex is a competitor of IVM; MAC did not provide Johnson Controls the option of leasing (or purchasing) IVM vending machines. Johnson Controls ultimately decided to purchase Apex vending machines from MAC.

IVM asserts that MAC's provision of Apex vending machines to Johnson Controls violated the exclusivity clause of the Agreement. In its motion, MAC argues that it is entitled to summary judgment on this claim because the Agreement "pertains only to the leasing or rental of vending machines from IVM for a period of sixty months or five years" and "does not provide for purchasing vending machines in any respect." Because it *sold* Apex vending machines rather than leasing them, MAC argues, it did not violate the Agreement.

The problem with this argument is that it ignores the plain language of the Agreement's exclusivity clause, which makes IVM the "exclusive provider" of vending machines provided by MAC to its customers. The clause is not ambiguous; it quite clearly requires MAC to eschew all other providers and obtain the vending machines it needs for its customers (at its "present Locations") from IVM. Therefore MAC clearly violated the Agreement when it sold Apex vending machines to Johnson Controls.[2]

This is not the end of the inquiry, however. "The elements of a breach of contract action

---

[2]Rather than acknowledging the plain language of the Agreement, MAC focuses on the impact that complying with the Agreement would have on it if one of its customers wanted to purchase, rather than lease, vending machines, arguing that it was not required to "walk away from an existing customer . . . [or] force its existing customer to negotiate with [IVM] if the customer want[ed] to purchase a machine." MAC Reply at 17. The fact that performing pursuant to a contract might have unfavorable consequences to one of the parties is irrelevant to the interpretation of an unambiguous contract provision. By its very nature, an exclusivity provision serves to limit options; a party agrees to abide by those limits when it agrees to the provision.

are the existence of a contract, the defendant's breach thereof, and damages." *W.S.K. v. M.H.S.B.*, 922 N.E.2d 671, 694 (Ind. Ct. App. 2010). In order to prevail, IVM has the burden of proving that it suffered damages as a result of MAC's breach of the Agreement.[3] The only way in which IVM could have been damaged as a result of MAC's breach is if Johnson Controls would have leased IVM vending machines if MAC had offered it that option rather than the option to purchase Apex vending machines. MAC argues in response to IVM's motion that IVM is not entitled to summary judgment because the evidence of record does not support such a finding. MAC is correct.

In support of its assertion that Johnson Controls would have leased IVM vending machines if it had been given that option by MAC, IVM offers evidence that (1) at the time it met with MAC, Johnson Controls was open to any type of vending machine as long as it met its specifications and would have considered either leasing or purchasing machines; (2) IVM offers vending machines that meet or exceed all of Johnson Controls' specifications; and (3) IVM has provided and currently provides vending machines at other Johnson Controls facilities, including some that were placed subsequent to the Apex machines being placed at Athens. Based upon these facts, IVM concludes that it "is confident that Johnson Controls would have contracted to

---

[3] It is here that MAC's argument that it should not have to walk away from a customer because the customer is not interested in IVM vending machines becomes relevant. "[W]hen the only remedy for a breach of contract is compensatory damages, a promisor has in effect an option to perform or pay damages rather than a duty to perform." *Classic Cheesecake Co., Inc. v. JPMorgan Chase Bank, N.A.*, 546 F.3d 839 (7th Cir. 2008). If, in fact, leasing IVM vending machines to Johnson Controls was not an option, then MAC's breach of the Agreement by selling Johnson Controls Apex machines did not injure IVM in any way, and IVM cannot prevail on its breach of contract claim. This would be an example of an "efficient breach," because the cost of breaching the Agreement (zero) was less than the cost of performing (losing Johnson Control's business). *See, generally*, *XCO Int'l, Inc. v. Pacific Scientific Co.*, 369 F.3d 998, 1001 (7th Cir. 2004).

have IVM machines installed pursuant to the terms of the Agreement if MAC had presented Johnson Controls with that option." Declaration of Michael Pitts at ¶ 20. The confident opinion of Mr. Pitts, who is IVM's President, is not evidence, however. Neither do the actual *facts* asserted by IVM establish, as a matter of law, that Johnson Controls would have chosen to lease IVM machines if that was what MAC had presented to it.[4] Rather, whether that is the case is a question of fact for the jury to resolve. Accordingly, both motions for summary judgment are **DENIED** with regard to this claim.

*Cancelled Purchase Order*

IVM also claims that MAC has breached the Agreement by refusing to pay certain fees IVM alleges it is entitled to as a result of MAC's cancellation of a purchase order. The facts relevant to this claim are largely undisputed. On December 12, 2008, MAC sent a purchase order to IVM for two vending machines to be placed with one of MAC's customers, Louisville Forge. The purchase order originally provided for a 36-month lease term instead of the 60-month term required by the Agreement; a few minutes after IVM pointed out the discrepancy, MAC sent a revised purchase order with 36 crossed out and replaced by 60. The revised purchase order was signed by MAC employee Alton Boone. Later that day, Al Taylor, MAC's

---

[4] Neither does the evidence of record establish that the opposite is true. While MAC asserts that Johnson Controls was not interested in leasing vending machines, but rather was open only to purchasing them or entering into a lease-to-purchase agreement, the "evidence" MAC points to in support of that assertion is the statement of its own vice president, Albert Taylor, that that was "Mac's understanding, based upon all the information it received from DSSI." Taylor Declaration at ¶ 6. That is no evidence at all. MAC also points to the testimony of Johnson Controls employee Erik Lawson that Johnson Controls "chose the purchasing option . . . based solely on [its] discussions with DSSI based on overall costs." Lawson Dep. at 41. This testimony, without more, does not establish anything, as MAC points to no evidence that suggests that the overall cost of leasing from IVM would have been an unacceptable, or even unattractive, option to Johnson Controls.

6

COO, cancelled the purchase order. The truck carrying the two vending machines had left IVM's facility about 30-45 minutes prior to IVM's receipt of the cancellation and had not yet arrived at Louisville Forge. IVM contacted the delivery company, which had the truck turn around and return the machines to IVM. The delivery company did not charge IVM anything for the aborted delivery.

The Agreement contains the following provisions:

> You and we agree that any purchase order may be cancelled without penalty prior to shipment of the machine(s) on said purchase order.
>
> * * *
>
> Each purchase order shall include a [90] day trial period as follows. Notwithstanding anything to the contrary elsewhere in this Agreement, you may terminate each purchase order without liability, obligation or penalty, except for expenses and obligations already incurred by us, by giving us written notice to that effect within [90] days after receiving the first monthly invoice for our services under this Agreement. Should you decide to terminate a purchase order within [90] days after receiving the first monthly invoice, you will be responsible for up to three months of management fees at [$405.00] per machine per month. In addition, you will be responsible for the costs of return freight, installation, programming, and travel not to exceed [$1500.00]. . . .

IVM has billed MAC $3,930.00 for the cancelled Louisville Forge purchase order: $2430.00 for three months of management fees for two machines plus a $1500.00 "miscellaneous termination expense." MAC argues that it does not owe anything under the Agreement.

Again, the relevant provision of the Agreement is not ambiguous and the plain language of the Agreement controls. MAC did not cancel the purchase order before the machines were shipped,[5] and therefore the first provision quoted above does not apply. The second quoted

---

[5]The plain meaning of the word "ship" is "[t]o send [goods] from one place to another, esp. by delivery to a carrier for transportation." Black's Law Dictionary (9th ed. 2009). Once the truck carrying the machines left IVM's facility for Louisville Forge, the machines had been

7

provision clearly does apply, however, and it establishes that MAC's cancellation of the purchase order was "without liability, obligation or penalty, except for expenses and obligations already incurred by [IVM]." It is undisputed that IVM incurred no expenses or obligations with regard to the cancelled purchase order; accordingly, as a matter of law, MAC owes IVM nothing.[6] MAC's motion for summary judgment is **GRANTED** and IVM's motion is **DENIED** as to this claim.

*Unpaid Invoices*

In its original complaint, which was filed on April 9, 2009, IVM alleged that MAC had failed to pay certain invoices. Those invoices apparently were paid at some point between the filing of the complaint and January 22, 2010, when MAC conducted a Rule 30(b)(6) deposition of IVM and elicited testimony that MAC's account was current. However, on July 15, 2010, IVM served amended discovery responses in which it stated that it was claiming that MAC had failed or refused to pay $6,728.28 for goods and services received. In its motion for summary judgment, filed on July 23, 2010, IVM asserts that MAC has failed to pay fifteen invoices totaling $6,728.28 since January 2010.

MAC objects strenuously to what it terms IVM's attempt to contradict its deposition testimony by now claiming that MAC's account is not current. This argument is without merit.

---

"shipped." Had they arrived at Louisville Forge, they would have been "delivered."

[6]Far from establishing an automatic penalty for cancellation, as IVM suggests, the reference to up to three months of management fees and $1500 for "the costs of return freight, installation, programming, and travel" in the Agreement simply sets a ceiling for the amount IVM could be responsible for if it cancelled an order during the 90-day trial period. The floor is established by the "expenses and obligations already incurred by [IVM]"–which in this case is zero.

IVM's deposition testimony on January 20, 2010, was accurate; as of that date, MAC's account was current. The earliest of the allegedly unpaid invoices are dated January 4, 2010; payment was not due under the terms of the Agreement for 30 days thereafter, which fell after the deposition. MAC is simply incorrect when it argues that IVM has "waived" any claim it has for unpaid invoices.

MAC also argues that IVM is improperly attempting to amend its complaint with its summary judgment motion. This is not entirely correct. IVM actually is seeking to *supplement* its complaint via its summary judgment motion. Because the allegedly unpaid invoices in question accrued after this case was filed, what IVM should have done was seek leave to file a supplemental complaint pursuant to Federal Rule of Civil Procedure 15(d). Because it has not yet done so,[7] it was not appropriate to move for summary judgment with regard to the unpaid invoices. Accordingly, IVM's motion for summary judgment is **DENIED** as to this claim.

SO ORDERED: 10/28/2010

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

---

[7]Any such motion for leave shall be filed within 5 days of the date of this Entry and shall include as an exhibit the proposed supplemental complaint. Absent a showing of prejudice by MAC–which seems highly unlikely given the very simple nature of the claim at issue–the Court would anticipate granting the motion for leave and, in the event the claim is disputed, resolving the claim at trial.

9

Copies to all counsel of record via electronic notification